## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ROBERT WILKINS, Individually and On Behalf of
All Others Similarly Situated,

              Plaintiff,

      vs.

MBNA CORPORATION, BRUCE L.
HAMMONDS, KENNETH A. VECCHIONE,
RICHARD K. STRUTHERS, CHARLES C.
KRULAK, JOHN R. COCHRAN, III, MICHAEL
G. RHODES, LANCE L. WEAVER and JOHNW.
SCHEFLEN,

              Defendants.

**C.A. No.**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff, Robert Wilkins ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding MBNA Corporation ("MBNA" or the "Company"), securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.    This is a federal class action on behalf of persons who purchased the securities of MBNA between January 20, 2005 and April 21, 2005, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

### JURISDICTION AND VENUE

2.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

3.    This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

4.    Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, the Company maintains a principal executive office in this Judicial District.

5.    In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

6.      Plaintiff, Robert Wilkins, as set forth in the accompanying certification, incorporated by reference herein, purchased MBNA securities at artificially inflated prices during the Class Period and has been damaged thereby.

7.      Defendant MBNA is a Maryland corporation with it s principal place of business located at 1100 North King Street, Wilmington, Delaware 19884. MBNA is the parent company of MBNA America Bank, N.A. ("MBNA America").

8.      Defendant Bruce L. Hammonds ("Hammonds") was, since December 30, 2003, the Company's Chief Executive Officer, President and a director.  Prior to December 30, 2003, Hammonds served as the Company's Chairman and Chief Executive Officer, and prior thereto as the Company's Chief Operating Officer.

9.      Defendant Kenneth A. Vecchione ("Vecchione") was, at all relevant times, the Company's Vice Chairman and Chief Financial Officer, as well as, the Chief Financial Officer of MBNA America.

10.     Defendant Richard K. Struthers ("Struthers") was, at all relevant times, the Company's Vice Chairman of MBNA and Vice Chairman of MBNA America.

11.     Defendant Charles C. Krulak ("Krulak") was, at all relevant times, the Company's Vice Chairman of MBNA and Vice Chairman of MBNA America.

12.     Defendant John R. Cochran, III ("Cochran") was, at all relevant times, the Company's the Chief Operating Officer and was the Chairman, Chief Executive Officer and President of MBNA America.

13.    Defendant Michael G. Rhodes ("Rhodes") was, at all relevant times, the Group Executive for the U.S. Credit Card Business Development.

14.    Defendant Lance L. Weaver ("Weaver") was, at all relevant times, the Company's Vice Chairman of MBNA and Vice Chairman of MBNA America.

15.    Defendant John W. Scheflen ("Scheflen") was, at all relevant times, the Vice Chairman of MBNA America.

16.    Defendants Hammonds, Vecchione, Struthers, Krulak, Cochran, Rhodes, Weaver and Scheflen, are collectively referred to hereinafter as the "Individual Defendants." During the Class Period, each of the individual defendants, as senior executive officers and/or directors of MBNA was privy to non-public information concerning its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

17.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers

-4-

and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

18.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of MBNA, by virtue of his or her high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

19.    As officers and controlling persons of a publicly-held company whose securities were and are registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange ("NYSE") and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and

accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

20.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board membership and/or executive and managerial positions with MBNA, each of the Individual Defendants had access to the adverse undisclosed information about MBNA financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about MBNA and its business issued or adopted by the Company materially false and misleading.

21.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

22.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of MBNA securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme

(i) deceived the investing public regarding MBNA business, operations, management and the intrinsic value of MBNA securities; and (ii) caused Plaintiff and other members of the Class to purchase MBNA securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities of MBNA between January 20, 2005 and April 21, 2005, or the Class Period, and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

24.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, MBNA's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by MBNA or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

25.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

26.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

-7-

27.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of MBNA; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

28.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

29.     MBNA America has two wholly owned non-United States bank subsidiaries: MBNA Europe Bank Limited ("MBNA Europe") and MBNA Canada Bank ("MBNA Canada"). MBNA Corporation is also the parent company of MBNA America (Delaware), N.A. ("MBNA Delaware"), a national bank. The Company is an international financial services company providing lending, deposit, and credit insurance products and services to its Customers. Through MBNA America, the Corporation is an issuer of endorsed credit cards, marketed primarily to members of associations and

customers of financial institutions and other organizations. In addition to its credit card lending,

MBNA Corporation makes other consumer loans, as well as commercial loans primarily to small

businesses. MBNA Corporation conducts its business in the United Kingdom, Ireland and Spain

through MBNA Europe, and in Canada through MBNA Canada.

## Materially False And Misleading
## Statements Issued During The Class Period

30.    On January 20, 2005, MBNA issued a press release entitled "MBNA Reports Fourth

Quarter Earnings of $.59 per Common Share - Increases Dividend 17% to $.56 Per Common Share -

Announces New $2 billion Common Stock Repurchase Program." Therein, the Company, in

relevant part:

> MBNA Corporation announced today that net income for the fourth
> quarter of 2004 was $768.9 million or $.59 per common share, an
> increase of 9%, compared with $703.5 million or $.54 per common
> share for the fourth quarter of 2003. For the full year, net income
> rose to $2.68 billion or $2.05 per common share, an increase of 15%
> compared to $2.34 billion or $1.79 per common share for 2003.

> "We grew earnings 15% in a slower industry growth environment
> and were able to launch several new and exciting programs such as
> our partnership with American Express and the acquisition of new
> businesses," said Bruce L. Hammonds, Chief Executive Officer of
> MBNA Corporation. "We are pleased with the results achieved in
> 2004."

> In addition, MBNA's Board of Directors has approved an increase of
> 17% in the quarterly dividend rate to $.14 per common share, which
> will increase the annual rate to $.56 per common share. MBNA has
> increased the dividend ever year since it became a public company.
> The cash dividend is payable April 1, 2005 to stockholders of record
> as of March 15, 2005.

> MBNA's Board of Directors has also approved a share repurchase
> program and authorized the repurchase of up to $2 billion of
> common stock over the next 2 years. Stock repurchases will be done

selectively based on capital levels, asset growth levels, and share performance. The program reflects the corporation's commitment to return excess capital to stockholders while balancing the important objectives of asset growth and maintaining a strong balance sheet. This repurchase program will be in addition to the corporation's existing share repurchase program which utilizes share repurchases to offset the impact of stock-based compensation programs.

MBNA announced that it will take a one-time restructuring charge in the first quarter of 2005. This restructuring charge is a result of the initiation of a voluntary early retirement program and a voluntary employee severance program. During the last several years, the corporation has taken steps to reduce its expenses through reduced hiring and other programs. Despite these efforts, MBNA remains staffed, particularly in management positions, at a level higher than anticipated business needs require. The company believes the voluntary early retirement and severance programs will assist the corporation in achieving staffing levels that meet expected future business needs and make MBNA more efficient.

The restructuring charge is expected to total approximately $300 million to $350 million pre-tax and result in anticipated pre-tax expense savings of approximately $150 million in 2005 and $200 million in 2006. Following the end of the voluntary early retirement and severance programs in March 2005, the corporation will undertake a review of its operations and look for opportunities to consolidate some of its facilities. The corporation may incur additional expenses for the disposition of fixed assets related to this consolidation.

"The restructuring we announced today was a difficult decision to make. We believe the programs we are offering to the people who work here are fair and provide those who elect to leave the company the ability to pursue other life goals," said Bruce L. Hammonds. "For our shareholders, this represents an important investment in our future. Combined with some important strategic initiatives started in 2004, we believe we are well positioned to achieve our long-term objectives." Some highlights for the year include:

> •      Hundreds of thousands of Customers activated their American Express- branded cards in the fourth quarter taking advantage of the valuable benefits of an American Express

branded card backed by MBNA's top-notch Customer satisfaction.

•      Throughout 2004, MBNA reduced its reliance on 0% promotional offers as a driver of receivables growth and introduced a number of value-based products centered upon the WorldPoints rewards platform.    MBNA is driving innovative products through its powerful affinity partner distribution network and providing Customers with a wide array of choices, based on their individual needs and interests. Whether Customers choose an NFL Extra Points Visa, a PGA Tour Platinum MasterCard, or one of many professional or alumni programs, MBNA has a credit card to fit each Customer's individual needs and preferences.

•      Internationally, MBNA's businesses in the United Kingdom, Canada, and Spain continue to provide additional loan growth opportunities through the same affinity marketing strategy that drove the company's success over the last 20+ years. MBNA has more than 5,000 affinity partners in its U.S. and international businesses.

•      MBNA continued to diversify in 2004 with the purchases of Premium Credit Limited (PCL), MBNA's premium financing company in the UK, and Sky Financial, MBNA's professional practice financing business in the U.S.

Loan receivables at December 31, 2004 were $33.8 billion, an increase of $134.8 million over year-end 2003. Total managed loans at December 31, 2004 were $121.6 billion, an increase of $3.1 billion over year-end 2003.

Losses on loan receivables and managed loans for the fourth quarter of 2004 were 3.74% and 4.43%, respectively. Loan losses continue to be lower than published industry levels. Delinquency on loan receivables and managed loans was 3.29% and 4.13%, respectively, at December 31, 2004.

31.    Additionally, on January 21, 2005, MBNA held an earnings conference call. During the conference call, defendants made the following statements with respect to its earning results.:

Now, we have been running off our zero rate loans, as most of you know, and we ran off from end of last year to the end of '04, $4 billion in zero rate loans. If you add that back in, our growth rate would have been 5 percent. The last numbers I saw for the industry through November was 2.5 percent, so we grew at about twice the industry, which is what we normally do.

\*\*\*

The fact that we're running off zero loans means that we don't have to re price as many of our existing customers on the back end ....

\*\*\*

Losses were 4.43 percent for the quarter, down 18 basis points for the third quarter, and down 54 basis points year over year. And delinquency was 413, and our losses continue to come down, at 413, delinquency is a very, very good year end delinquency rates, and as we look out, it would seem to us that delinquency and losses should continue to decrease.

\*\*\*

We expect earnings growth to average about 12 percent over the next several years. There will be years when it's more than 12, and years when it's less than 12. **And in fact, in 2005, we expect it to be more like 10 percent.** We expect it to [sic] the 10 percent this year primarily because we're starting the year off at a relatively low level of average growth. This, again, is a result of slow industry growth and our pullback on zero percent marketing.

As the year progresses, we expect asset growth to pick up. First, the impact of moving away from zero rates. We still have more outstandings to run down there, that's going to continue through the second half, and in the early part of the third quarter. At that point, when you look at us year over year, it will normalize. We also expect the industry growth rate to pick up in the second half of 2005.

\*\*\*

Our 2005 EPS is $2.36, a 10% increase over 2004. We expect, in 2005, moderate loan growth, supported by strong retail growth and lower cash volume. We expect the risk-adjusted net interest margin

-12-

to expand. Net interest margin will remain stable and we will see improving loan loss rates.

Operating income growth will be in line with loan growth. Higher interchange growth will result as a byproduct of stronger retail volume. And lower penalty and income lower penalty fee income will occur as the credit quality improves. The impact of our chronic over limit fee pricing in 2005 is nearly $140 million that we plan to grow through in '05.

Expenses will grow significantly slower than loan growth and we look for low single-digit growth. In addition, our expense growth includes the cost of stock option expensing in the second half of 2005. We will continue to see asset quality improvement. The effective tax rates should return back to historical levels and we will use enhanced capital management programs, if necessary, to support our $2.26 EPS goal.

**In varied economic and competitive environments, MBNA has consistently grown year over year and has a long track record of producing exceptional financial results. As Bruce stated, in the last couple of years, we have demonstrated our ability to grow earnings at a rate faster than asset growth.**

**And we feel confident that we will continue to deliver consistent, profitable growth well into the future. Our core management team has been in place for over 20 years, the same team that has helped to deliver these exceptional results.**

***

Growing profitable loans; let me just discuss with you our zero strategy. It's a place that we are happily diverging from our peers. We obviously were into zero in a big way a few years ago. About 12 to 18 months ago, we saw things happening in this area that we didn't like.

We saw surfing activity increasing, so we saw more and more customers open the account just for zero, and pay it off before the rate changed. The duration on zero moved out. When we started doing zero, we were doing it for a four-month duration. Today, you need to be added 15 months or maybe even life. And we still the marketing disappear.

As I said earlier, zero is bad, I think, for the entire industry, but I know it's bad for MBNA. It forces you to re price many of your other customers to pay for it. That's not the way to run a business, to take your long-term customers and re price those to bring in new customers at zero. And just a personal opinion, I think it can make your marketing and advertising areas very lazy. If you can give things away, you sure don't have to be creative.

So we are moving away from zero and focusing on replacing these programs with rewards programs. It's better long-term profitability, and it's better for the customer. Now, this chart shows you why we do that. The line of the top is what happens when you put on a zero rate loan.

You can see the balance billed is much faster, early activation and high balance transfers, but over the long-term, full rate loans balances actually exceed zero, just about at the 9-month mark when we get ready to re price our zero-rate loan. So, it makes no sense for us to continue to do those zero-rate loans, with very few exceptions. The rewards programs give us opportunity to reinforce the affinity relationship. Zero certainly does not leverage affinity marketing.

Now again, like I said earlier, we decreased $4 billion in zero-rate loans in the U.S. This is what will happen next year. It will continue to come down, as I said earlier, through the second quarter and the early part of the third quarter and then it will normalize. We don't love the impact that that has on our top line, but it is absolutely the right thing to do.
(Emphasis Added.)

32.    On April 13, 2005, MBNA issue a press release entitled "MBNA America Bank, N.A. Securitizes $750 Million of Credit Card Receivables from the MBNA Credit Card Master Note Trust." Therein, the MBNA and MBNA America announced that through the MBNA Credit Card Master Note Trust, it would issue $750 million in credit card asset backed notes.

33.    The statements contained in ¶¶ 30-32 were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that the Company grossly underestimated the cost of the restructuring charge associated with the Company's previously

announced plan to reduce overhead by offering early retirement to its workers; (2) that the Company was experiencing a high level of customer delinquencies; (3) that the Company's customers were paying down their credit card bills, particularly on high-interest-rate cards, reducing the dollar value of managed loans in MBNA's portfolios; (4) that due to faster customer pay downs MBNA was forced to reevaluate its interest-only strips resulting in a $206 million loss in securitization activity; and (5) that the Company's projected earnings growth of 10 percent in fiscal 2005 lacked in all reasonable basis when made.

## The Truth Begins To Emerge

34.     On April 21, 2005, MBNA issued a press release entitled "MBNA Reports Earnings Per Common Share of $.02, Including the Impact of the Previously Announced Restructuring Plan." Therein, the Company stated:

> MBNA Corporation announced today that net income for the first quarter of 2005 was $31.7 million or $.02 per common share compared with $519.7 million or $.40 per common share for the first quarter of 2004. Net income in the first quarter of 2005 includes a restructuring charge of $767.6 million pre-tax. Without the restructuring charge, net income was $514.1 million or $.40 per common share.
>
> In addition to the restructuring charge, the Corporation's results were further impacted by unexpectedly high payment volumes from U.S. credit card customers. The higher payments reduced managed loans in the quarter more than in prior years. Additionally, the payment volumes were particularly higher on accounts with higher interest rates, which adversely impacted the Corporation's yield on managed loans.
>
> As a result of these recent trends, in the revaluation of its interest-only strip receivable, the Corporation projected lower excess spreads and higher payments. This reduced the interest-only strip receivable and resulted in a net loss from securitization activity of $206.6 million. The net loss from securitization activity is included in other

operating income and caused the Corporation's first quarter 2005 other operating income to be lower than its first quarter 2004 other operating income.

The Corporation is implementing programs to offset the higher payment rates in the U.S. Card business. "It is a difficult environment right now. However, we've made progress on recent product introductions, diversification strategies, and improvements in credit quality and operating efficiency," said Bruce L. Hammonds, MBNA's Chief Executive Officer.

Based on the first quarter results and trends, management believes that MBNA's 2005 earnings per share will be significantly below its 10% growth objective.

Loan receivables at March 31, 2005 were $31.8 billion, an increase of $1.8 billion over the first quarter of 2004. Total managed loans at March 31, 2005 were $116.6 billion, a decrease of $1.0 billion compared to the first quarter of 2004. Total volume in the quarter rose to $49.3 billion, an increase of 5% over the first quarter of 2004. Total volume includes sales volume of $33.3 billion, which increased by 10% over the first quarter of 2004, and cash advance volume of $16.0 billion, which decreased by 5% from the first quarter of 2004.

Losses on loan receivables and managed loans for the first quarter of 2005 were 3.98% and 4.48%, respectively. Delinquency on loan receivables and managed loans was 2.93% and 4.17%, respectively, at March 31, 2005. Based on improving asset quality trends, the provision for possible credit losses was $77.9 million lower in the first quarter of 2005 than in the first quarter of 2004.

The Corporation's other operating expense in the first quarter of 2005 was $2.1 billion, including the restructuring charge. The Corporation's focus on improved operating efficiency has generated better results than anticipated, and other operating expense, excluding the restructuring charge in the first quarter of 2005, was lower than in the first quarter of 2004 by 6%. In addition, during the first quarter the Corporation repurchased approximately $250 million of common stock pursuant to its $2 billion share repurchase program announced in January 2005.

The Corporation continued to advance its business development strategies in the first quarter, building upon the success of its

-16-

customized affinity rewards programs as well as its diversification efforts. Some highlights for the quarter include:

\*\*\*

As previously reported, MBNA Corporation has made significant progress on its plan to reduce its expense base. In connection with the restructuring plan, the Corporation will incur a charge of approximately $785 million pre-tax, $767.6 million pre-tax of which was recognized in the first quarter of 2005. The charge includes three major components -- staff reductions related to voluntary early retirement and voluntary severance programs, the disposition of fixed assets relating to facilities closings, and contract terminations. Approximately 85% of the charge will result in cash expenditures.

Approximately $500 million of the charge is related to the voluntary early retirement program and voluntary severance program announced in January 2005. The Corporation expects staff reductions from the programs to result in pre-tax expense savings of approximately $210 million in 2005 and approximately $225 million in 2006. This charge is higher than previously announced because more people than anticipated decided to take advantage of the programs' benefits. The success of this initiative will assist the Corporation in reducing its staff, particularly in management positions, to levels that meet expected future business needs and make MBNA more efficient.

Approximately $115 million of the charge is related to the disposition of fixed assets resulting from the Corporation's previously announced review of its operations. After this review, management decided to consolidate operations and close some facilities. The Corporation expects the disposition of fixed assets to result in pre-tax expense savings of approximately $15 million in 2005 and approximately $25 million in 2006.

In addition, the Corporation terminated a marketing agreement with a third party vendor that marketed the Corporation's products to endorsing organizations and terminated a limited number of other agreements. Management determined that the marketing agreement did not adequately support the Corporation's long-term objectives. Approximately $170 million of the charge is related to these contract terminations. The Corporation expects the contract terminations to result in pre-tax expense savings of approximately $25 million in 2005 and approximately $50 million in 2006.

-17-

35.    News of this shocked the market. Shares of MBNA fell $3.83 per share or 16.57 percent, on April 21, 2005, to close at $19.28 per share.

## UNDISCLOSED ADVERSE FACTS

36.    The market for MBNA's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, MBNA's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired MBNA securities relying upon the integrity of the market price of MBNA's securities and market information relating to MBNA, and have been damaged thereby.

37.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of MBNA's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

38.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about MBNA's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of MBNA and its business, prospects and operations, thus causing the Company's securities to be

overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

39.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding MBNA, their control over, and/or receipt and/or modification of MBNA's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning MBNA, participated in the fraudulent scheme alleged herein.

40.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

41.    Additionally, during the Class Period and with the Company's stock trading at an artificially inflated price Individual Defendants sold 3,553,078 shares for gross proceeds of $96,687,532. As evidenced by the following chart:

|  | Date | # of Shares | Proceeds |
|---|---|---|---|
| Lance L. Weaver | 01/25/2005<br>01/25/2005<br>03/01/2005 | 66,450 @ $26.764<br>376,835 @ $26.764<br>5,013 @ $25.570<br>*Total Proceeds:*<br>*448,298* | $1,780,876.5<br>$10,085,612<br>$128,182<br>*Total Proceeds:*<br>*$11,994,670* |
| Kenneth A. Vecchione | 01/25/2005<br>01/25/2005<br>03/01/2005 | 14,236 @ $26.700<br>100,462 @ $26.700<br>4,011 @ $25.570<br>*Total Shares:*<br>*118,709* | $380,101<br>$2,682,335<br>$102,561.27<br>*Total Proceeds:*<br>*$3,164,997* |
| John W. Scheflen | 01/25/2005<br>01/25/2005<br>03/01/2005 | 82,665 @ $26.854<br>125,810 @ $26.854<br>2,340 @ $25.570<br>*Total Shares:*<br>*210,815* | $2,219,885<br>$3,378,501<br>$59,834<br>*Total Proceeds:*<br>*$5,658,221* |
| Michael G. Rhodes | 01/25/2005<br>01/25/2005 | 100,210 @ $26.759<br>406,040 @ $26.759<br>*Total Shares:*<br>*506,250* | $2,681,519<br>$10,865224<br>*Total Proceeds:*<br>*$13,546,743.75* |
| Charles C. Krulak | 01/25/2005<br>01/25/2005<br>01/31/2005<br>01/31/2005<br>02/01/2005<br>02/01/2005<br>03/01/2005 | 11,860 @ $26.612<br>130,000 @ $26.612<br>7,517 @ $26.500<br>92,483 @ $26.500<br>25,029 @ $26.750<br>274,971 @ $26.750<br>3,510 @ 25.570<br>*Total Shares:*<br>*545,370* | $315,618<br>$3,459,560<br>$199,200<br>$2,450,799.5<br>$669,525.75<br>$7,355,474<br>$89,750<br>*Total Proceeds:*<br>*$14,539,929* |

| Bruce L. Hammonds | 01/27/2005<br>01/27/2005<br>03/01/2005 | 78,620 @ $26.508<br>351,409 @ $26.508<br>8,355 @ $25.570<br>**Total Shares:**<br>**438,384** | $2,084,058<br>$9,315,149<br>$213,637<br>**Total Proceeds:**<br>**$9,528,787** |
| --- | --- | --- | --- |
| John R. Cochran III | 01/27/2005<br>01/27/2005<br>03/01/2005 | 150,935 @ $26.508<br>531,159 @ $26.508<br>7,520 @ $25.570<br>**Total Shares:**<br>**689,614** | $4,000,984<br>$14,079,962<br>$192,286<br>**Total Proceeds**<br>**$22,274,219** |
| Richard K. Struthers | 02/03/2005<br>02/03/2005<br>03/01/2004 | 133,161 @ $26.839<br>457,464 @ $26.839<br>5,013 @ $25.570<br>**Total Shares:**<br>**595,638** | $3,573,908<br>$12,277,876<br>$128,182<br>**Total Proceeds:**<br>**$15,979,966** |

### Applicability Of Presumption Of Reliance:
### Fraud-On-The-Market Doctrine

42.     At all relevant times, the market for MBNA securities was an efficient market for the following reasons, among others:

(a)  MBNA stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)  As a regulated issuer, MBNA filed periodic public reports with the SEC and the NYSE;

(c)  MBNA regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) MBNA was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

43.    As a result of the foregoing, the market for MBNA securities promptly digested current information regarding MBNA from all publicly-available sources and reflected such information in MBNA's stock price. Under these circumstances, all purchasers of MBNA securities during the Class Period suffered similar injury through their purchase of MBNA securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

44.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of MBNA who knew that those statements were false when made.

## FIRST CLAIM
### Violation Of Section 10(b) Of
### The Exchange Act Against And Rule 10b-5
### Promulgated Thereunder Against All Defendants

45.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

46.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase MBNA securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

47.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for MBNA securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

48.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of MBNA as specified herein.

49.     These defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of MBNA value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about MBNA and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of MBNA securities during the Class Period.

50.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his or her responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

51.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing MBNA's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

52.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of MBNA securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of MBNA's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired MBNA securities during the Class Period at artificially high prices and were damaged thereby.

53.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other

-25-

members of the Class and the marketplace known the truth regarding the problems that MBNA was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their MBNA securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

54.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

55.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation Of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

56.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

57.    The Individual Defendants acted as controlling persons of MBNA within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contend are false and misleading. The Individual Defendants were provided with or had unlimited

-26-

access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

58.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

59.    As set forth above, MBNA and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 12, 2005

**ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A.**

By: _____

Joseph A. Rosenthal (No. 234)
Jeffrey S. Goddess (No. 630)
919 Market Street, Suite 1401
Wilmington, DE 19899-1070
(302)656-4433

**SCHIFFRIN & BARROWAY, LLP**
Marc A. Topaz, Esquire
Richard A. Maniskas, Esquire
Tamara Skvirsky, Esquire
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706

**Attorneys for Plaintiff**

**CERTIFICATION OF NAMED PLAINTIFF**
**PURSUANT TO FEDERAL SECURITIES LAWS**

I, (print name) __Robert Wilkens_____ ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the Complaint and authorizes its filing.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's transaction(s) in the **MBNA Corporation (NYSE: KRB)** security that is the subject of this action during the Class Period is/are as follows[1]:

| No. of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| 120 | BUY | 2/25/05 | $25.63 |
| | | | |
| | | | |
| | | | |

[1]List additional transactions on a separate sheet of paper, if necessary.

5.    Plaintiff has complete authority to bring a suit to recover for investment losses.

6.    During the three years prior to the date of this Certification, Plaintiff has sought to serve or served as a representative party or a class in the following actions filed under the federal securities laws (if none, so indicate): __NONE__

7.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __11__ day of __MAY_____, 200_5_.

_____
Signature

__ROBERT WILKENS__
Print Name

__10 DOCK ROAD__
Address

__NORWALK, CT 06854__
City, State, Zip